UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO. 3:22-CV-00633-GNS-CHL

APRIL HALLERON                                                                      PLAINTIFF

v.

RELIANCE STANDARD LIFE INSURANCE COMPANY                         DEFENDANT

## MEMORANDUM OPINION AND ORDER

This matter is before the Court on the parties' cross-motions for judgment (DN 26, 27). The motions are ripe for adjudication. For the reasons stated below, Plaintiff's motion is **GRANTED**, and Defendant's motion is **DENIED**.

## I.      BACKGROUND

Plaintiff Dr. April Halleron ("Dr. Halleron") is a physician who has been employed by Baptist Healthcare System, Inc. since July 2019. (Short-Term Disability Admin. R. 25, 29, DN 14 [hereinafter STD Admin. R.]). Dr. Halleron participates in employer-sponsored short-term disability ("STD") and long-term disability ("LTD") plans delivered by Defendant Reliance Standard Life Insurance Company ("Reliance") and governed by the Employee Retirement Income Security Act ("ERISA"). (STD Admin. R. 2; Long-Term Disability Admin. R. 2, DN 15 [hereinafter LTD Admin. R.]; Suppl. Long-Term Disability Admin. R. 2, DN 21-2 [hereinafter Suppl. LTD Admin. R.]). Dr. Halleron's STD coverage became effective on January 1, 2022, and her LTD insurance became effective when she began her employment in July 2019. (STD Admin. R. 32; LTD Admin. R. 48).

During her employment, Dr. Halleron was diagnosed with and treated for a variety of medical conditions, including severe postural orthostatic tachycardia syndrome ("POTS"), which

is a condition characterized by dizziness, fatigue, joint pain, and syncope.[1]  (STD Admin. R. 29, 34, 43, 117-18, 161-62).  In June 2022, Dr. Halleron submitted a claim for STD benefits related to her POTS and went on leave beginning July 1, 2022.  (STD Admin. R. 29, 72, 117-19).  On July 27, 2022, Matrix Absence Management ("Matrix"), as administrator for Reliance, denied Dr. Halleron's STD claim because her illness fell under the pre-existing condition exclusion in the STD policy.  (STD Admin. R. 76).  Matrix then opened an LTD claim, which would not be barred by a pre-existing condition exclusion, but it later also denied that claim because it determined that Dr. Halleron did not meet the policy definition of "Totally Disabled."  (STD Admin. R. 61-62; LTD Admin. R. 93-95).  Each denial letter explained how to request a review of the denial and the timeline for doing so.  (STD Admin. R. 77; LTD Admin. R. 95).  Dr. Halleron, through counsel, sent letters requesting her files, which she received, and asking questions about the denials and appeal processes, but she did not appeal either decision.  (*See* STD Admin. R. 245-50; LTD Admin. R. 306-11; Pl.'s Mot. J. 12, DN 26).

In December 2022, Dr. Halleron brought this action against Reliance, asserting a 29 U.S.C. § 1132(a) claim for wrongful denial of benefits.  (Compl. ¶¶ 47-50, DN 1).  The parties have filed dueling motions for judgment.  (Pl's Mot. J.; Def.'s Mot. J., DN 27).

## II.     JURISDICTION

The Court has jurisdiction over this matter because a federal question is presented.  *See* 28 U.S.C. § 1331.

---

[1] Syncope is a "loss of consciousness and postural tone caused by diminished cerebral blood flow."  *Syncope*, *Stedman's Medical Dictionary* (2014); *see also Faint*, *Stedman's Medical Dictionary* (2014) ("Extremely weak; threatened with syncope" or "An episode of syncope").

### III.    STANDARD OF REVIEW

ERISA allows a plan participant to sue "to recover benefits due to [her] under the terms of

[her] plan . . . ."  29 U.S.C. § 1132(a)(1)(B).  Courts review an ERISA fiduciary or administrator's

denial of benefits under either a *de novo* standard or the more deferential arbitrary and capricious

standard.  *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 107 (1989).  The parties

dispute which standard of review is appropriate, but as explained below, the denials do not survive

even an arbitrary and capricious review.  (Pl.'s Mot. J. 12-14; Def.'s Mot. J. 12-15, 22-23).  Under

the arbitrary and capricious standard, a court "will uphold the administrator's decision 'if it is the

result of a deliberate, principled reasoning process and if it is supported by substantial evidence.'"

*Elliott v. Metro. Life Ins. Co.*, 473 F.3d 613, 617 (6th Cir. 2006) (quoting *Glenn v. MetLife*, 461

F.3d 660, 666 (6th Cir. 2006), *aff'd sub nom. Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105 (2008)).

### IV.    DISCUSSION

#### A.    Long-Term Disability

##### 1.    *The Denial*

Dr. Halleron's LTD policy with Reliance (the "LTD Policy") provides monthly benefits to

an insured if she "(1) is Totally Disabled as the result of a Sickness or Injury covered by this

Policy; (2) is under the Regular Care of a Physician; (3) has completed the Elimination Period;

and (4) submits satisfactory proof of Total Disability . . . ."  (Suppl. LTD Admin. R. 21).  The LTD

Policy defines "Totally Disabled" as follows:

> [A]s a result of an Injury or Sickness, during the Elimination Period and thereafter
> an Insured cannot perform the material duties of his/her Regular Occupation;
> > (1) "Partially Disabled" and "Partial Disability" mean that as a result of an
> > Injury or Sickness an Insured is capable of performing the material duties
> > of his/her Regular Occupation on a part-time basis or some of the material
> > duties on a full-time basis.  An Insured who is Partially Disabled will be
> > considered Totally Disabled, except during the Elimination Period; and

> (2) "Residual Disability" means being Partially Disabled during the Elimination Period. Residual Disability will be considered Total Disability.

(Suppl. LTD Admin. R. 10).[2]

Dr. Halleron's occupation requires a variety of duties, including, *inter alia*, performing physical exams; treating and referring patients; communicating with patients, providers, and pharmacies; and assisting the establishment of office procedures and medical protocol and following them. (LTD Admin. R. 237-38). Dr. Halleron's employer identified a number of physical and mental abilities that are required to perform those job functions:

Physical Requirements

- Strength – Position requires ability to occasionally lift objects less than __ pounds.
- Manual Dexterity – Position requires incumbent to constantly perform moderately difficult manipulative skills such as keyboarding, etc.
- Coordination – Position requires incumbent to frequently perform tasks which require hand-eye coordination such as keyboard skills, running computers, etc.
- Mobility – Position requires incumbent to constantly sit for prolonged periods of time.
- Visual Discrimination – Position requires incumbent to discriminate colors, as in reading colors of electrical wires or warning lights and see both near [and] far away.
- Hearing – Position requires incumbent to hear normal sounds with some background noise, as in answering the telephone.

Mental Requirements

- Concentration – Position requires incumbent to frequently concentrate on fine detail with some interruption.
- Attention Span – Position requires incumbent to frequently attend to a task/function for longer than 60 minutes at a time.
- Conceptualization – Position requires the ability to frequently able to understand and relate to the theories behind several related concepts.
- Memory – Position requires incumbent to constantly remember multiple tasks/assignments given to self and others over long periods of time.

---

[2] There are two definitions of "Totally Disabled" in the LTD Policy. (*See* Suppl. LTD Admin. R. 10). This is the definition that applied to Dr. Halleron's employment class at the time of her disability. (*See* LTD Admin. R. 48; Suppl. LTD Admin. R. 10; Scott Aff. ¶ 12, DN 21-1).

- Communication – Position requires incumbent to constantly communicate verbally using advanced level vocabulary and communicate in writing, using advanced written skills.

(LTD Admin. R. 239).

Dr. Melissa Perrotta ("Dr. Perrotta"), Dr. Halleron's treating cardiologist, evaluated Dr. Halleron on March 11, 2022. (LTD Admin. R. 296). Dr. Perrotta noted that temperature or positional changes caused Dr. Halleron's blood pressure to drop and her heart rate to increase, resulting in dizziness and near syncope. (LTD Admin. R. 303). Dr. Halleron only had around four hours of energy per day and was also suffering from a variety of other symptoms, including fatigue, joint pain, chest pain and palpitations, weakness, and light-headedness. (LTD Admin. R. 299-300, 303). Dr. Perrotta prescribed Modafinil to help with Dr. Halleron's energy levels. (LTD Admin. R. 303). On March 29, 2022, Dr. Perrotta saw Dr. Halleron again and noted that Modafinil caused energy crashes, so she stopped taking it, but Dr. Halleron was then reporting five hours of energy from increased water intake, exercise, and other non-medicinal treatments. (LTD Admin. R. 134). Despite the modest improvement to her energy level, Dr. Halleron was still suffering from fatigue, pain, dizziness, syncope, weakness, light-headedness, and other symptoms. (LTD Admin. R. 136-37). In June 2022, Dr. Perrotta provided Matrix with Dr. Halleron's diagnosis of severe POTS and her assessment that Dr. Halleron needed disability benefits to manage her "significant symptoms that interfere with her quality of life[,]" which included "dizziness with near syncope, extreme fatigue[,] and constant joint pain." (LTD Admin. R. 130-32). Dr. Perrotta opined that Dr. Halleron needed to rest, but could resume work in October 2022 with modifications that she will need for the rest of her life. (LTD Admin. R. 130-31).

On September 20, 2022, Matrix denied Dr. Halleron's LTD claim. (LTD Admin. R. 93). The denial letter briefly recounted Dr. Halleron's medical history and noted that her energy had

slightly improved.  (LTD Admin. R. 94).  Matrix concluded that "based upon the medical information available on file," Dr. Halleron did not fit the definition of "Totally Disabled" because "there was no evidence of a physical condition that rose to a level to have precluded [her] from having work capacity."  (LTD Admin. R. 94).  The substance of Matrix's decision was one paragraph, and Matrix did not support its conclusion with any medical analysis about Dr. Halleron's condition or whether she is able to perform her job functions.  (*See* LTD Admin. R. 93-94).

### 2.      ***Dr. Halleron Is Deemed to Have Exhausted Her Administrative Remedies***

Reliance's primary argument is that Dr. Halleron's claim for LTD benefits is barred because she failed to appeal through Reliance's administrative appeals process.  (Def.'s Mot. J. 17-22).  True, plaintiffs are ordinarily required to exhaust their administrative remedies before filing ERISA lawsuits in federal court.  *Coomer v. Bethesda Hosp., Inc.*, 370 F.3d 499, 504 (6th Cir. 2004) (citing *Miller v. Metro. Life Ins. Co.*, 925 F.2d 979, 986 (6th Cir. 1991)).  ERISA regulations, however, deem a claimant's administrative remedies exhausted if a plan fails to establish or follow claims procedures that are consistent with the ERISA regulations' many requirements.  29 C.F.R. § 2560.503-1(l)(1).  Additionally, a plan for disability benefits must *strictly* comply with ERISA claims regulations.  29 C.F.R. § 2560.503-1(l)(2)(i).

The claims regulations, *inter alia*, require adverse benefit determination notices to discuss the decision and explain any disagreement with or choice not to follow the views of the claimant's treating physician.  29 C.F.R. § 2560.503-1(g)(1)(vii)(A)(i).  Matrix's determination that Dr. Halleron is not disabled did not address Dr. Perrotta's assessment of Dr. Halleron's condition or her conclusion that Dr. Halleron required disability benefits and work modifications for the rest of

her life.  (LTD Admin. R. 93-94).  Accordingly, ERISA regulations deem Dr. Halleron's

administrative remedies exhausted and allow Dr. Halleron immediate access to judicial review.

### 3.      *The Denial Was Arbitrary and Capricious*

Reliance contends that even if Dr. Halleron exhausted her administrative remedies, the

decision was not arbitrary and capricious.  This argument is not well taken.  Matrix's decision was

arbitrary and capricious because it was not "the product of 'a deliberate, principled reasoning

process.'"  *Elliott*, 473 F.3d 617 (quoting *Glenn*, 461 F.3d at 666).  The Sixth Circuit's opinion in

*Elliott* is instructive here.

In *Elliott*, the claimant was severely injured in a car accident resulting in long-term health

complications that prompted Elliott to seek long-term disability benefits, which were administered

by defendant MetLife.  *Id.* at 615.  Her claim was supported by medical records from her treating

physician, Dr. Schneider, who reported that she was suffering from chronic pain, anxiety,

weakness, and numbness.  *Id.*  MetLife denied Elliott's claim without reasoning, concluding that

her records "d[id] not support a condition of a severity that would prevent [her] from working."

*Id.*  Elliott appealed, including a letter from Dr. Schneider, who explained that Elliott required

work limitations due to her condition.  *Id.* at 616.  MetLife denied Elliott's appeal, relying on the

opinion of another doctor who disregarded Dr. Schneider's assessment and concluded that Elliott

was not disabled without referencing her job duties.  *Id.*

As with the LTD Policy here, MetLife had to determine whether Elliott's condition

precluded her from performing her job.  *Id.* at 617.  The Sixth Circuit observed that MetLife could

only have made a "reasoned judgment" about Elliott's capability if it "relied on medical evidence

that assessed Elliott's physical ability to perform job-related tasks."  *Id.* at 618 (citation omitted).

The Sixth Circuit concluded that neither the initial denial nor the denial of the appeal was a

reasoned denial because they merely recited her medical diagnoses, did not analyze her job duties, and rejected the conclusions of her treating physician without reasoning. *Id.* at 619-21. The Sixth Circuit held that because of those failings, MetLife's denials were arbitrary and capricious. *Id.* at 621.

Similarly, Matrix's denial also recited Dr. Halleron's medical history without analyzing whether she could perform her job duties. (*See* LTD Admin. R. 94). Matrix did not address Dr. Perrotta's opinion that Dr. Halleron needed disability benefits and would need work modifications for the rest of her life, which notably could qualify her under the "Partially Disabled" portion of the LTD Policy's definition of "Totally Disabled." (*See* LTD Admin. R. 94; Suppl. LTD Admin. R. 10). Because Matrix plainly failed to "rel[y] on medical evidence that assessed [Dr. Halleron's] physical ability to perform job-related tasks[,]" the denial was arbitrary and capricious. *Elliott*, 473 F.3d at 618 (citation omitted).

### B.    Short-Term Disability Denial

#### 1.    *The Denial*

Dr. Halleron's STD policy (the "STD Policy") pays weekly benefits if the insured "(1) is Disabled due to Sickness or Injury; and (2) becomes Disabled while insured by this Policy." (STD Admin. R. 16). "Disabled" means that the insured is "(1) unable to do the material duties of his/her job; and (2) not doing any work for payment; and (3) under the regular care of a physician." (STD Admin. R. 9). Under the STD Policy, benefits will not be paid, however, for a disability "(1) caused by; (2) contributed to by; or (3) resulting from a Pre-existing Condition" unless the insured has been working longer than 12 months from the insured's STD Policy effective date. (STD Admin. R. 22). An insured has a Pre-Existing Condition if:

> (1)    the disability begins in the first twelve (12) months after the Insured's effective date; and

(2)      he/she has received medical Treatment, consultation, care or services, including diagnostic procedures, or took prescribed drugs or medicines for the Sickness or Injury, whether specifically diagnosed or not, causing such disability, during the three (3) months immediately prior to the Insured's effective date of insurance.

(STD Admin. R. 22).

In denying her claim for STD benefits, Matrix did not analyze whether Dr. Halleron is disabled but determined that assuming she was, her condition fell under the pre-existing condition exclusion.  (*See* STD Admin. R. 76-77).  Matrix noted that Dr. Halleron's date of disability was July 1, 2022, which was within twelve months of her insurance effective date, which was January 1, 2022.  (STD Amin. R. 76).  Matrix found that Dr. Halleron had consulted her primary care physician, Dr. Shannon Lynn ("Dr. Lynn"), on October 28, 2021, which was during the three-month period before her insurance effective date on January 1, 2022.  (STD Admin. R. 32, 76-77).  Matrix observed that Dr. Halleron complained to Dr. Lynn at the visit on October 28, 2021, of "persistent syncopal spells as well as tachycardia/increased heart rate[,]" so without further explanation, Matrix concluded that Dr. Halleron had "received medical treatment, consultation, care or services, or took prescribed drug or medicine during the period . . . ."  (STD Admin. R. 77).  Accordingly, Matrix determined that Dr. Halleron's POTS was a pre-existing condition and denied her STD benefits.  (STD Admin. R. 77).

### 2.      *The Denial Was Arbitrary and Capricious*

Matrix's denial of Dr. Halleron's STD benefits suffers from the same failure as its LTD denial—it is also arbitrary and capricious because it was not "the product of 'a deliberate, principled reasoning process.'"  *Elliott*, 473 F.3d 617 (quoting *Glenn*, 461 F.3d at 666).  Under the STD Policy, Matrix had to determine whether Dr. Halleron "received medical Treatment, consultation, care or services, including diagnostic procedures, or took prescribed drugs or

9

medicines for the Sickness or Injury, whether specifically diagnosed or not, causing such disability, during the three (3) months immediately prior to the Insured's effective date of insurance." The Sixth Circuit has interpreted the word "for" in this context to indicate intent or purpose, so "for the Sickness or Injury" in the pre-existing condition exclusion requires Dr. Halleron to have received treatment, consultation, care or services, etc. related to her POTS. *See Mitzel v. Anthem Life Ins. Co.*, 351 F. App'x 74, 82 (6th Cir. 2009).

At the October 28, 2021, appointment, Dr. Lynn diagnosed Dr. Halleron with "attention-deficit hyperactivity disorder" and "chronic anxiety and depression[,]" and she prescribed Adderall. (STD Admin. R. 213). Dr. Lynn did note that Dr. Halleron was experiencing pain and fatigue but that it was "normal for fall and winter," and she did record worsening syncopal spells, but she did not mention POTS or otherwise connect any of Dr. Halleron's symptoms to POTS. (STD Admin. R. 210). Matrix, in its denial letter, also did not explain the connection between ADHD and POTS, or whether the record of the appointment fell under the pre-existing condition exclusion because of treatment, consultation, care or services, diagnostic procedures, or medication. (STD Admin. R. 93-94). In sum, Matrix merely concluded that POTS was a pre-existing condition without explanation, which is arbitrary and capricious. *See Clark v. Metro. Life Ins. Co.*, 67 F.3d 299, 1995 WL 592102, at *4 (6th Cir. 1995) (per curium) (unpublished table decision) ("The *conclusion* that his conditions were pre-existing is not a *reason* why MetLife believes they were pre-existing.").

### C.    Remedy

"[W]here the 'problem is with the integrity of [the plan's] decision-making process,' rather than 'that [a claimant] was denied benefits to which he was clearly entitled,' the appropriate remedy generally is remand to the plan administrator." *Elliott*, 473 F.3d at 622 (alterations

original) (quoting *Buffonge v. Prudential Ins. Co. of Am.*, 426 F.3d 20, 31 (1st Cir. 2005)).  Here,

as in *Elliott*, Dr. Halleron is not clearly entitled to LTD benefits, particularly because it is unclear

whether her condition precludes her from performing her job responsibilities.  *See id.*  With regard

to her STD benefits, Dr. Halleron is not clearly entitled to benefits because her condition could

still fall under the pre-existing condition exclusion.  Accordingly, Dr. Halleron's LTD and STD

benefits claims are remanded to Reliance for a full and fair review.[3]

## V.    CONCLUSION

For the foregoing reasons, **IT IS HEREBY ORDERED** as follows:

1.    Plaintiff's Motion for Judgment (DN 26) is **GRANTED**, and this matter is

**REMANDED** for a full and fair review of the denial of Plaintiff's claims for long-term and short-

term disability benefits.

2.    Defendant's Motion for Judgment (DN 27) is **DENIED**.

3.    Plaintiff shall file her brief requesting for attorney's fees and costs pursuant 29

U.S.C. § 1132(g) by **August 14, 2024**, Defendant shall file its responsive brief by **August 28,**

**2024**, and Plaintiff shall file her reply by **September 4, 2024**.

Greg N. Stivers, Chief Judge
United States District Court

July 29, 2024

cc:    counsel of record

---

[3] In her briefing, Dr. Halleron raised several other concerns with Reliance's claims and appeals procedures, but because Dr. Halleron is deemed to have exhausted her administrative remedies, the Court need not address each alleged procedural violation.  (*See* Pl.'s Mot. J. 17).  Reliance is instructed to perform a full and fair review of Dr. Halleron's claims on remand and to strictly comply with the ERISA claims procedures contained in 29 C.F.R. § 2560.503-1.  *See* 29 C.F.R. § 2560.503-1(l)(2)(i); 29 U.S.C. § 1133(2).